David J. Jordan (1751)
*david.jordan@stoel.com*
Jordan C. Hilton (17506)
*jordan.hilton@stoel.com*
STOEL RIVES LLP
201 S Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: 801.328.3131

*Attorneys for Prime Alliance Bank, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| PRIME ALLIANCE BANK, INC., a Utah corporation,<br><br>           Plaintiff,<br><br>   v.<br><br>REGENTS CAPITAL CORPORATION, a California corporation,<br><br>           Defendant. | **COMPLAINT**<br><br>Case No. _____<br><br>The Honorable _____<br><br>**JURY DEMAND** |

## THE PARTIES, JURISDICTION, AND VENUE

1.       Prime Alliance Bank, Inc. ("Prime") is a Utah corporation with its

principal place of business in Woods Cross, Utah.

2.       Regents Capital Corporation ("Regents") is a California corporation

with its principle place of business in Costa Mesa, California.

3.       The Court has subject matter jurisdiction pursuant to 28 U.S.C.

§ 1332. Both parties are diverse, and the amount in controversy exceeds $75,000.

4.      This Court has personal jurisdiction over Regents pursuant to Utah Code Ann. § 78B-3-205 because Regents has: transacted business within the State of Utah; contracted to supply services in the State of Utah; and caused injuries within the State of Utah. This dispute arises from Regents' contacts with this judicial district, and Regents has purposefully availed itself of the Utah forum such that it could reasonably anticipate being haled into court in Utah. Requiring Regents to litigate this case in the District of Utah does not offend traditional notions of fair play and substantial justice and is permitted by the Due Process Clause of the United States Constitution.

5.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District.

**FACTUAL ALLEGATIONS**

**A.      Regents Conducts Business as an Equipment Finance Broker.**

6.      Regents is a commercial equipment finance broker. As part of its business, Regents connects firms with equipment financing needs to banks and other financial institutions.

7.       In some cases, in exchange for a fee, Regents provides initial equipment financing and subsequently assigns its rights in the "paper"—i.e. the

2

notes, leases, or other financing documents—to banks and other financial institutions.

8.     When acting as a broker or assigning its paper, Regents limits the involvement of the prospective lender or assignee. For example, Regents structures the transaction so that it conducts due diligence on the debtor/lessee and directly communicates with the debtor/lessee.

9.     Regents intentionally limits the involvement of assignee-banks to preserve its profitable role as an intermediary between equipment finance debtors/lessees and banks.

**B.     Regents and Prime Execute a Master Sale of Chattel Paper and Security Agreement.**

10.    On September 28, 2018, Prime and Regents entered into a Master Sale of Chattel Paper and Security Agreement ("Chattel Paper Agreement"). A copy of the Chattel Paper Agreement is attached hereto as **Exhibit A**.

11.    The Chattel Paper Agreement provides Regents with the right to "request [Prime] from time to time to purchase, in [Prime]'s discretion, [Regents]' rights, interest in and title to certain Paper . . . together with all monies due, monies to become due, and all other agreements, instruments and documents related thereto." Ex. A § 2.

3

12.     Under the Chattel Paper Agreement, each transfer of an item of paper must be "evidenced by and described in a specification," which specification must include the amount, terms of payment, equipment covered by the paper, and other relevant information. *Id*.

13.     In the Chattel Paper Agreement, Regents made several representations and warranties to Prime "as of this date of this Agreement and as of the date the Purchase Price is paid with respect to each such Specification, the Paper transferred thereby, the Debtor under such Paper, and the Equipment." *Id*. at § 4. These representations included, *inter alia*, that:

- Regents "has no adverse credit information about the Debtor or any Guarantor or any Pledgor which has not been disclosed to and approved by [Prime] in writing, and has furnished to [Prime] all credit information received by [Regents] with respect thereto." *Id*. at § 4(b)(ii).

- "No default, and no event that, but for the passage of time or the giving of notice or both, would constitute a default, has occurred under the provisions of the Paper by either [Regents] or the Debtor." *Id*. at § 4(b)(vi).

- Regents "has delivered to [Prime] all material written information in its possession with respect to the Paper, the Debtor, any Guarantor or Pledger and the Equipment. All statements, documents,  instruments, information, representations and warranties made or furnished by [Regents] to [Prime] relating to the business and financial affairs of [Regents], this Agreement, any Specification, the Paper, the Debtor, any Guarantor or Pledgor and the Equipment are (or

4

will be when delivered to [Prime]) in all material respects true and complete, and [Regents] knows of no fact which, if known to [Prime], would affect [Prime]'s reliance on any of the foregoing." *Id.* at § 4(d).

- Regents "has a first priority purchase money security interest in" the equipment." *Id.* at § 4(a)(iv).

- "[Prime]'s security interest in the Equipment is, or will constitute, upon the filing or recording of the UCC financing statements delivered by [Regents] to [Prime] together with each Specification, a valid, enforceable and perfected first priority purchase money security interest in the Equipment pursuant to applicable law." *Id.* at § 4(c)(iv).

- Regents "has duly filed UCC financing statements which, if [Regents]' interest in the Equipment were deemed to be a security interest, would perfect a first priority security interest of [Regents] in the Equipment in the jurisdiction where the Equipment is located." *Id.* at § 4(c)(vi).

- "Acknowledgment copies of these UCC financing statements, together with acknowledgment copies of UCC financing statements duly filed to protect [Prime]'s interest in the Paper, have been delivered to [Prime] with the Specification, or will be so delivered promptly upon receipt of such copies from the applicable filing office." *Id.* at § 4(c)(vii).

14. The Chattel Paper Agreement also contains certain covenants of

Regents, which obligate Regents to, *inter alia*:

- "immediately upon obtaining knowledge thereof, notify [Prime] in writing of each default, or any circumstances which might lead to a default pursuant to the provisions of any item of Paper." *Id.* at § 5(b).

5

- "immediately notify [Prime] of the assertion of any claim or the threat or institution of any litigation that, if adversely determined, would have a material adverse effect on any item of Paper or the Equipment covered thereby, or on the assets, prospects, business or condition (financial or otherwise) of [Regents]." *Id.* at § 5(j).

- "execute and deliver to [Prime], at [Regents]' sole cost and expense, such security agreements, UCC financing statements, amendments and other documents or instruments, in form and substance satisfactory to [Prime], as [Prime] may request, from time to time, to evidence, perfect, maintain and enforce [Prime]'s rights in each item of Paper and security interest in the related Property." *Id.* at § 5(c).

- deliver "fully executed UCC financing statements on form UCC-1 and/or UCC-3 as required by [Prime] for filing by [Prime] against [Regents] and the Debtor." *Id.* at § 2(c)(iv).

15.     The Chattel Paper Agreement provides significant consequences in the event Regents breaches a representation or warranty or fails to perform its covenants or other obligations under the agreement.

16.     For example, Section 8(a) of the Chattel Paper Agreement provides:

- "If [Regents] defaults in the performance of any of its obligations under any item of Paper, this Agreement or any agreement or document or instrument related thereto, *or if any warranty or representation made by [Regents] herein or in any Specification in respect of any item of Paper, the Debtor thereunder, any Guarantor or Pledger or the Equipment shall be incorrect*, then [Regents] agrees to pay to [Prime] on demand, at [Prime]'s option and demand, the sum of: (i) the then unpaid balance of rental payments accruing under each item of Paper to which such default or breach pertains, each discounted using the

6

same rate applicable to the Specification by which such Paper was sold by [Regents] to [Prime], plus all reasonable costs and expenses incurred by [Prime] relating to each such Paper and the Equipment covered thereby, including (without limitation) the costs and expenses for the maintenance, repair, protection and preservation of the Equipment and all reasonable attorneys' fees and expenses in connection with defending or enforcing [Prime]'s rights and remedies under this Agreement, such Paper and the Equipment leased thereunder or otherwise, plus (ii) all other fees paid to [Regents] with respect to each such Paper. collectively, as the "Repurchase Price." *Id.* at § 8(a) (emphasis added).

17.     Further, if Regents fails to pay Prime the Repurchase Price within thirty days of Prime's written demand, Regents must "immediately upon Buyer's demand, purchase any or all of the Paper sold to [Prime] hereunder for the Repurchase Price therefor." *Id.* at § 10(a).

18.     Thus, if Regents breaches a representation, warranty, or obligation under the Chattel Paper Agreement or any specification thereunder, it must pay the Repurchase Price as it relates to the item of paper to which the default pertains. And if Regents fails to pay such Repurchase Price within thirty days upon Prime's written demand, Regents must pay, at Prime's request, the Repurchase Price for *any or all* of the paper Prime purchased under the Chattel Paper Agreement.

19.     The Chattel Paper Agreement does not contain a so-called non-reliance provision.

7

20.     Any waivers of or amendments to provisions in the Chattel Paper

Agreement must be made in writing. *Id.* at § 11(a).

21.     Utah law governs the interpretation and enforcement of the Chattel

Paper Agreement. *Id.* at § 11(e).

**C.      Regents Executes a Master Lease Agreement and Lease Schedules with Mitec Powertrain Inc. after Mitec's Parent Company had Filed for Bankruptcy.**

22.     Having executed the Chattel Paper Agreement with Prime in

September 2018, Regents began seeking opportunities to lease manufacturing and

other heavy equipment to lessees, with the intention of thereafter assigning such

leases to Prime under the Chattel Paper Agreement.

23.     To that end, on or before January 28, 2019, Regents identified Mitec

Powertrain Inc. ("Mitec"), as a potential lessee to whom Regents could lease

equipment (and later assign such leases to Prime).

24.      Mitec was, before its dissolution on September 30, 2020, an

automotive component wholesaler based in Michigan that had operations in Ohio.

25.     Mitec's parent company was Mitec Automotive AG ("MAG"), a

corporation based in Germany.

26.     Crucially, prior to November 2018, MAG had provided substantial

and consistent financial support to Mitec, without which Mitec would not have

8

been able to operate. Further, from time to time, Mitec would temporarily defer payments to MAG to provide Mitec additional liquidity. The financial viability of MAG was thus critical to the financial viability of Mitec.

27.     Due to decreased sales, on or about November 2018, MAG filed for bankruptcy in Germany and thereafter ceased providing any financial support to Mitec.

28.     Regents was aware of MAG's existence as Mitec's parent and knew that the financial viability of MAG was crucial to Mitec's ability to make payments under any contemplated equipment leases.

29.     A reasonable business broker in Regents' position would have ascertained the financial viability of MAG and would have discovered that MAG had filed for bankruptcy in November 2018.

30.     However, in conducting its due diligence of Mitec in December 2018 and January 2019, Regents failed to discover or disregarded that MAG had filed for bankruptcy in November 2018. Regents' due diligence prior to executing any agreements with Mitec was negligent, careless, and incomplete.

31.     After negligently conducting due diligence, on January 28, 2019, Regents executed a Master Lease Agreement ("MLA") with Mitec, a copy of which is attached hereto as **Exhibit B**.

109349852.7 0042618-00004

32.     The MLA provided that Regents would lease to Mitec certain equipment as set out in "Lease Schedules" and otherwise pursuant to the terms and conditions of the MLA.

33.     The MLA also provided that an "event of default" shall occur, among other things, if "any representation or warranty made by [Mitec] . . . in conjunction with the [MLA] or financial or credit information submitted by or on behalf of [Mitec] . . . shall prove to have been false or materially misleading when made." Ex. B § 14(f).

34.     Upon information and belief, the financial information Mitec submitted to Regents was materially misleading because it did not reveal that MAG had filed for bankruptcy in Germany in November 2018.

35.     Also on January 28, 2019, Mitec and Regents executed Lease Schedule No. 152667 ("Lease 152667"), whereby Regents leased to Mitec a Felsomat Loader and an RZ160 Gear Grinding Machine, among other equipment.

36.     On February 6, 2019, Regents executed a second lease schedule with Mitec, Lease Schedule No. 152702 ("Lease 152702" and collectively with Lease 152667, the "Mitec Leases"), whereby Regents leased to Mitec certain additional manufacturing equipment.

109349852.7 0042618-00004

**D.    Regents Assigns the Mitec Leases to Prime.**

37.    Having leased certain equipment to Mitec, Regents sought to immediately assign its rights under the Mitec Leases to Prime pursuant to "Specifications" as contemplated in the Chattel Paper Agreement.

38.    As with its due diligence prior to executing the MLA, Regents' due diligence prior to executing the Specifications with Prime was negligent, careless, incomplete, and materially misleading. Accordingly, Regents failed to discover or disregarded MAG's bankruptcy prior to assigning the Mitec Leases to Prime.

39.    To make matters worse, due to Regents' role as a broker, Regents purposefully limited Prime's ability to conduct due diligence directly with Mitec prior to the execution of any Specification.

40.    Because Regents limited Prime's ability to directly conduct due diligence on Mitec's financial viability, Prime relied on Regents' expertise and due diligence in vetting and selecting Mitec as a creditworthy lessee.

41.    Based on the representations, warranties, and covenants in the Chattel Paper Agreement, Prime and Regents executed two Specifications concerning equipment leased to Mitec.

42.    On February 5, 2019, Regents sold and assigned its rights under Lease 152667 to Prime pursuant to a Specification ("Specification 152667"). A copy of

11

Specification 152667 is attached hereto as **Exhibit C**. Specification 152667 had a purchase price of $2,056,511.14, with payments to Prime to commence on April 29, 2019.

43.     In Specification 152667, Regents confirmed that "as of the date of this Specification," the representations and warranties in the Chattel Paper Agreement "are in all respects true and accurate on the date hereof." Ex. C. § 3.

44.     On February 26, 2019, Regents sold and assigned its rights under Lease 152702 to Prime pursuant to a Specification ("Specification 152702" and collectively with Specification 152667, the "Mitec Specifications"). A copy of Specification 152702 is attached hereto as **Exhibit D**. Specification 152702 had a purchase price of $336,129.00, with payments to Prime to commence on May 20, 2019.

45.     As with Specification 152667, in Specification 152702, Regents confirmed that "as of the date of this Specification," the representations and warranties in the Chattel Paper Agreement "are in all respects true and accurate on the date hereof." Ex. D. § 3.

46.     Specification 152667 was initially funded by Prime on February 5, 2019, with additional disbursements on March 11, 2019, and November 4, 2019.

109349852.7 0042618-00004

Specification 152702 initially funded on February 26, 2019, with additional disbursements on March 13, 2019, May 8, 2019, and October 7, 2019.

47.    Due to Regents': (i) own negligent due diligence in failing to inquire concerning MAG's financial health and discover MAG's recent bankruptcy; (ii) limitations placed on Prime to conduct Prime's own due diligence; and (iii) representations concerning Mitec's financial health, in February 2019, when Regents assigned the Mitec Leases to Prime, Prime was not aware that Mitec's parent company had filed for bankruptcy. Prime would not have executed the Mitec Specifications had it known of MAG's bankruptcy.

**E.    Regents Fails to Inform Prime of MAG's Bankruptcy After the Parties Execute the Specifications, and Mitec Eventually Ceases Payments.**

48.    In addition to failing to accurately represent Mitec's true economic position at the time the parties executed the Mitec Specifications, Regents also failed to inform Prime of MAG's bankruptcy after the parties executed the Specifications.

49.    Upon information and belief, at least prior to November 4, 2019—the date of the final disbursement from Prime under the Chattel Paper Agreement and thus the most recent date Regents reaffirmed its representations and warranties under the Chattel Paper Agreement—Regents had actual and constructive

109349852.7 0042618-00004

knowledge and written documentation of MAG's bankruptcy and knowledge of the effects such bankruptcy would have on Mitec's solvency.

50.     Despite this knowledge and documentation, Regents never communicated to Prime that MAG had filed for bankruptcy in November 2018.

51.     Mitec made a few payments to Prime under the Mitec Specifications. However, on June 1, 2020, Mitec ceased making the payments it owed to Prime.

52.     Mitec ceased making payments to Prime under the Mitec Specifications as a direct result of the cessation of funding Mitec previously received from MAG, which MAG had ceased upon its bankruptcy.

53.     Under the Mitec Specifications, Prime is owed no less than $2,453,748.11, and all other costs, fees, payments, and expenses as described in Section 8(a) of the Chattel Paper Agreement.

## F.     Regents Assigns Certain Other Leases to Prime without Making the Filings Required under the Chattel Paper Agreement and Specifications.

54.     In addition to its negligent due diligence and representations regarding the Mitec Specifications, Regents executed, and breached, other Specifications it executed with Prime under the Chattel Paper Agreement.

109349852.7 0042618-00004

55.     On April 22, 2019, Regents and Kenwood Envision, LLC

("Kenwood") executed Lease 152870 ("Kenwood Lease 152870") for certain

equipment.

56.     On June 5, 2019, Regents assigned its rights in Kenwood Lease

152870 to Prime pursuant to a Specification ("Kenwood Specification 152870"). A

copy of Kenwood Specification 152870 is attached hereto as **Exhibit E**. Kenwood

Specification 152870 had a purchase price of $4,487,186.51.

57.     On July 22, 2019, Regents and Kenwood executed Lease 153128

("Kenwood Lease 153128" and collectively with Kenwood Lease 152870, the

"Kenwood Leases") for certain equipment. As with the Mitec Leases, Regents

structured the transactions so that it would conduct the vast majority of direct due

diligence on Kenwood.

58.     On August 6, 2019, Regents assigned its rights in Kenwood Lease

153128 to Prime pursuant to a Specification ("Kenwood Specification 153128"

and collectively with Kenwood Specification 152870, "Kenwood Specifications").

A copy of Kenwood Specification 153128 is attached hereto as **Exhibit F**.

Kenwood Specification 153128 had a purchase price of $1,134,475.20. The

Kenwood Specifications are subject to and governed by the Chattel Paper

Agreement.

15

59.     In the Kenwood Specifications, Regents contracted to grant, assign and convey to Prime "a continuing first priority purchase money security interest" in the equipment described in the Kenwood Leases and the records relating to such equipment. Exs. E, F § 2.

60.     As with the Mitec Specifications, Regents confirmed that "as of the dates of the [Kenwood Specifications]," the representations and warranties in the Chattel Paper Agreement "are in all respects true and accurate on the date hereof." Exs. E, F § 3.

61.     Prior to executing the Kenwood Specifications, Regents failed to properly make all the UCC and other filings required under the Chattel Paper Agreement and Kenwood Specifications. Specifically, Regents failed to execute UCC and other filings necessary to secure and transfer to Prime a "valid, enforceable and perfected first priority purchase money security interest in the Equipment." Ex. A. §§ 4(c)(iv), (vi).

62.     Thus, on June 5 and August 6, 2019, when Prime and Regents executed the Kenwood Specifications, Regents did not have—and did not deliver to Prime—a perfected, first-priority purchase money security interest in the equipment.

16

63. To date, Regents has failed to obtain a perfected, first-priority purchase money security interest in the equipment described in the Kenwood Leases.

64. As a result of Regents' failure to make the necessary UCC filings to perfect Prime's first priority purchase money security interest, other Kenwood creditors, including CenterBank, have asserted that they—and not Prime—have "the first and best security interest in all of the assets located on the Kenwood . . . premises."

**G. Prime Notifies Regents of Its Breaches under the Chattel Paper Agreement and Specifications, and Regents Fails to Cure Its Breaches or Pay the Repurchase Price.**

65. Prime learned of MAG's bankruptcy and Mitec's insolvency on or around August 13, 2020.

66. Upon learning of MAG's bankruptcy and Mitec's insolvency, on November 4, 2020, Prime sent a letter to Regents to "demand that Regents . . . repurchase the Mitec Powertrain transaction pursuant to Section 8(a)" of the Chattel Paper Agreement.

67. On November 10, 2020, Prime received an "Announcement to General Creditors" from Mitec. The letter stated that MAG "filed for bankruptcy in Germany in November 2018," and thereafter "ceased providing financial support

109349852.7 0042618-00004

to" Mitec, which had "insufficient funds to continue its operations in the ordinary course of business." The letter further announced that Mitec owed its secured creditor about $19 million and that "it is highly unlikely that there will be any funds to pay unsecured creditors."

68.     On December 4, 2020, Prime notified Regents that it was exercising its rights under Section 10(a) of the Chattel Paper Agreement to demand repayment of the Repurchase Price for any or all "paper" under the Chattel Paper Agreement.

69.     Soon after learning of Mitec's insolvency and dissolution, in January 2021, Prime discovered that Regents had failed to properly file and deliver to Prime a perfected, first-priority purchase money security interest in the Kenwood equipment as required under the Chattel Paper Agreement and Kenwood Specifications.

70.     Promptly upon learning of Regents' failure to make the proper filings, Prime sent a letter to Regents to demand that Regents repurchase the Kenwood transactions pursuant to Section 8(a) of the Chattel Paper Agreement.

71.     Despite Prime's demands for repayment under the Chattel Paper Agreement, Regents has failed to pay Prime the sums owing under such Agreement. Thus, Regents has failed to pay to Prime: (i) the Repurchase Price for

18

the Mitec Specifications; (ii) the Repurchase Price for the Kenwood Specifications; and (iii) the amounts due under the transactions Prime requested Regents repay pursuant to Section 10(a) of the Chattel Paper Agreement.

## **FIRST CLAIM FOR RELIEF**
(Breach of Contract—Chattel Paper Agreement/Mitec Specifications)

72.     Prime hereby incorporates by reference the allegations set forth in the preceding paragraphs as though set forth fully herein.

73.     The Chattel Paper Agreement is a valid and enforceable contract between Regents and Prime.

74.     Prime has fully performed its obligations under the Chattel Paper Agreement.

75.     Specification 152667 is a valid and enforceable contract between Regents and Prime.

76.     Prime has fully performed its obligations under Specification 152667.

77.     Specification 152702 is a valid and enforceable contract between Regents and Prime.

78.     Prime has fully performed its obligations under Specification 152702.

79.     Regents breached the Chattel Paper Agreement and Mitec Specifications in at least the following ways:

19

(i)     by falsely representing to Prime that "[n]o default . . . has occurred under the provisions of the [MLA] by either [Regents] or [Mitec]," in violation of Section 4(b)(vi) of the Chattel Paper Agreement. This representation was false because, at the time Prime and Regents executed the Mitec Specifications, there had been a default under Section 14(f) of the MLA—i.e. Mitec had provided financial information that was "materially misleading."

(ii)     by falsely representing to Prime that Regents had "delivered to [Prime] all material written information in its possession with respect to the Paper, [Mitec], any Guarantor or Pledger and the Equipment," in violation of Section 4(d) of the Chattel Paper Agreement. This representation was false because: (i) the fact that Mitec's parent company had filed for bankruptcy constitutes "material written information with respect to . . . [Mitec]"; and (ii) Regents possessed and did not disclose such information to Prime at the times the parties executed the Mitec Specifications or at the times Prime disbursed funds under the Mitec Specifications.

(iii)     by falsely representing to Prime that "[a]ll statements, documents,  instruments, information, representations and warranties made or furnished by [Regents] to [Prime] relating to the business and financial affairs of [Regents], this Agreement, any Specification, the Paper, [Mitec], any Guarantor or

20

Pledgor and the Equipment are (or will be when delivered to [Prime]) in all material respects true and complete," in violation of Section 4(d) of the Chattel Paper Agreement. This representation was false because Regents' failure to disclose MAG's bankruptcy rendered its statements regarding Mitec materially incomplete at the times the parties executed the Mitec Specifications and at the times Prime disbursed funds under the Mitec Specifications.

(iv)    by, upon obtaining actual and constructive knowledge of MAG's bankruptcy and the effects such bankruptcy would have on Mitec's solvency and ability to meet its financial obligations, failing to "immediately" disclose MAG's bankruptcy and the effects such bankruptcy would have on Mitec's solvency and ability to pay, in violation of Section 5(b) of the Chattel Paper Agreement.

(v)    by failing to "immediately" notify Prime of "any claim or threat or institution of any litigation that, if adversely determined, would have a material adverse effect on any item of Paper or the Equipment covered thereby," in violation of Section 5(j) of the Chattel Paper Agreement.

80.    As a direct and proximate result of Regents' breaches of the Chattel Paper Agreement and the Mitec Specifications, Prime has suffered, and continues

to suffer, damages in an amount to be determined at trial, but no less than $2,453,748.11.

81. Prime is also entitled to recover for "any or all" of the paper Regents sold to it under the Chattel Paper Agreement, in Prime's discretion, pursuant to Section 10(a) of the Chattel Paper Agreement. This includes no less than $1,336,897.85—the approximate amount currently due under Kenwood Specification 153128—plus no less than $4,524,068.87—the approximate amount currently due under Kenwood Specification 152870.

82. Prime is also entitled to recover its attorneys' fees and costs of this action pursuant to Section 8(a) of the Chattel Paper Agreement.

## SECOND CLAIM FOR RELIEF
(Breach of Contract—Chattel Paper Agreement/Kenwood Specifications)

83. Prime hereby incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

84. The Chattel Paper Agreement is a valid and enforceable contract between Regents and Prime.

85. Prime has fully performed its obligations under the Chattel Paper Agreement.

86. The Kenwood Specifications are valid and enforceable contracts between Regents and Prime.

22

87. Prime has fully performed its obligations under the Kenwood Specifications.

88. Regents breached the Chattel Paper Agreement and Kenwood Specifications in at least the following ways:

i. by falsely representing to Prime that Regents "has duly filed UCC financing statements which . . . would perfect a first priority security interest of [Regents] in the Equipment." Ex. A § 4(c)(vi). This representation was false because Regents had not and did not "duly file" UCC financing statements that would perfect its first-priority security interest in the Kenwood equipment, either before or after executing the Kenwood Specifications.

ii. by falsely representing to Prime that "copies of these UCC financing statements . . . have been delivered to [Prime] with the Specification, or will be so delivered promptly upon receipt of such copies from the applicable filing office." Ex. A § 4(c)(vii). This representation was false because Regents had not filed and did not deliver to Prime UCC financing statements that would perfect a first-priority security interest in the Kenwood equipment.

iii. by failing to "grant[] and assign[] and convey[] to [Prime] a continuing first priority purchase money security interest" in the equipment leased

23

under the Kenwood Leases, in violation of Section 2 of the Kenwood Specifications.

iv.     by failing to deliver proper, "fully executed UCC financing statements on form UCC-1 and/or UCC-3 as required by [Prime] for filing by [Prime] against [Regents] and the Debtor," in violation of Section 2(c)(iv) of the Chattel Paper Agreement.

89.     As a direct and proximate result of Regents' breaches of the Chattel Paper Agreement and the Kenwood Specifications, Prime has suffered, and continues to suffer, damages in an amount to be determined at trial, but no less than $5,860,966.72.

90.     Prime is also entitled to recover its attorneys' fees and costs of this action pursuant to Section 8(a) of the Chattel Paper Agreement.

## THIRD CLAIM FOR RELIEF
(Negligence)

91.     Prime hereby incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

92.     Regents owed Prime an independent duty of care, which required Regents to act reasonably, including making reasonable due diligence inquiries and efforts, and to not misrepresent, omit, or fail to disclose material facts. Regents owed such an independent duty of care to Prime for at least the following reasons:

24

because Prime and Regents were in privity of contract; because Regents was in a superior position to know the material facts than was Prime; because Prime's injuries in the event of a breach of Regents' duty of care were highly foreseeable; because Prime's injuries in the event of a breach of Regents' duty of care were highly likely; and because Regents is in the business and profession of supplying information for the guidance of others in their business transactions.

93.     Regents breached its duty to Prime by failing to inquire about MAG's financial health, failing to initially discover MAG's bankruptcy, failing to communicate MAG's bankruptcy with Prime after discovery, severely limiting Prime's ability to conduct due diligence directly with Mitec and Kenwood, and failing to perfect Regents' first-priority security interest.

94.     Regents' breaches of duty to Prime have actually and proximately harmed Prime because Prime unknowingly, in reliance on Regents' expertise and representations, and through no fault of Prime: (i) purchased the Mitec Leases, which were to be repaid by a now-dissolved company with a bankrupt parent; and (ii) purchased the Kenwood Leases, which did not have a perfected, first-priority security interest. Accordingly, Regents' actions have harmed Prime in an amount to be determined at trial, but not less than $8,314,714.83.

109349852.7 0042618-00004

## FOURTH CLAIM FOR RELIEF
(Negligent Misrepresentation)

95.     Prime hereby incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

96.     Donald F. Hansen, Jr., the chief executive officer of Regents, and Dennis Odiorne, the president of Regents, both acting in their official capacities and on behalf of Regents, made several material misrepresentations to Prime (each of the misrepresentations described in (i) through (vi) of this paragraph a "Misrepresentation" and collectively, the "Misrepresentations"). These Misrepresentations occurred when the parties executed the Chattel Paper Agreement on September 28, 2018 (signed by Mr. Hansen), when the parties executed Specification 152667 on February 5, 2019 (signed by Mr. Odiorne), when the parties executed Specification 152702 on February 26, 2019 (signed by Mr. Hansen), when the parties executed Kenwood Specification 153128 on August 6, 2019 (signed by Mr. Odiorne), when the parties executed Kenwood Specification 152870 on June 5, 2019 (signed by Mr. Odiorne), and when Prime disbursed payments pursuant to the Mitec Specifications on March 3 and 13, May 8, October 7, and November 4, 2019. Specifically, Regents repeatedly misrepresented that:

i.      Regents "has no adverse credit information about [Mitec] . . . which has not been disclosed to and approved by [Prime] in writing";

26

ii.     "No default, and no event that, but for the passage of time or the giving of notice or both, would constitute a default, has occurred under the provisions of the Paper by either [Regents] or [Mitec]";

iii.    Regents "has delivered to [Prime] all material written information in its possession with respect to the Paper, [Mitec], any Guarantor or Pledger and the Equipment";

iv.     "All statements, documents, instruments, information, representations and warranties made or furnished by [Regents] to [Prime] relating to the business and financial affairs of [Regents], this Agreement, any Specification, the Paper, [Mitec], any Guarantor or Pledgor and the Equipment are (or will be when delivered to [Prime]) in all material respects true and complete"; and

v.      Regents "knows of no fact which, if known to [Prime], would affect [Prime]'s reliance on any of the foregoing [representations]."

vi.     Regents "has duly filed UCC financing statements which . . . would perfect a first priority security interest of [Regents] in the Equipment in the jurisdiction where the Equipment is located," and that "copies of these UCC financing statements . . . have been delivered to [Prime]

27

with the Specification, or will be so delivered promptly upon receipt

of such copies from the applicable filing office."

97.     Prime relied on the Misrepresentations in executing the Chattel Paper

Agreement, Mitec Specifications, and the Kenwood Specifications, and in making

disbursements thereunder.

98.     Based on Regents' expertise as an equipment lease broker and

Regents' insistence on conducting the vast majority of direct due diligence on

Mitec and Kenwood as the broker between Mitec and Kenwood, on one hand, and

Prime, on the other hand, Prime's reliance on the Misrepresentations was

reasonable.

99.     Regents owed an independent duty of care to Prime based on the

parties' legal relationship. This duty of care required Regents to act reasonably,

including making reasonable due diligence inquiries and efforts, and to not

misrepresent material facts. Regents owed such an independent duty of care to

Prime for at least the following reasons: because Prime and Regents were in privity

of contract; because Regents was in a superior position to know the material facts

than was Prime; because Prime's injuries in the event of a breach of Regents' duty

of care were highly foreseeable; and because Prime's injuries in the event of a

breach of Regents' duty of care were highly likely.

28

100.    Regents also owed Prime an independent duty of care based on the nature of Regents' business and profession of supplying information for the guidance of others in their business transactions. As an equipment leasing finance broker, Regents regularly supplies information to parties contemplating business transactions. Accordingly, Regents had a duty to exercise that care and competence in obtaining and communicating information that Prime was justified in expecting from a competent, professional equipment leasing broker.

101.    Each of the Misrepresentations constitute careless and negligent misrepresentations of material fact. Specifically:

(i)     Regents' Misrepresentation that it has no adverse credit information regarding Mitec was negligent or careless because Regents knew or should have through reasonable diligence known that Mitec's parent company was bankrupt.

(ii)    Regents' Misrepresentation that "[n]o default . . . has occurred under the provisions of the Paper by either [Regents] or [Mitec]" was negligent and careless because Regents knew or should have known that there had been a default under Section 14(f) of the MLA.

(iii)   Regents' Misrepresentation that it had "delivered to [Prime] all material written information in its possession with respect to the

29

Paper, [Mitec], any Guarantor or Pledger and the Equipment" was negligent and careless because, at least by November 4, 2019, Regents had actual and constructive knowledge that MAG was bankrupt and yet had not delivered such information to Prime.

(iv)   Regents' Misrepresentation that the information it delivered to Prime concerning Mitec's "business and financial affairs" was "in all material respects true and complete" was negligent and careless because Regents knew or should have known through reasonable diligence that Mitec's parent company was bankrupt.

(v)   Regents' Misrepresentation that it knew of "no fact which, if known to [Prime], would affect [Prime]'s reliance on any of the foregoing" representations was negligent and careless because Regents knew or should have known through reasonable diligence that Mitec's parent company was bankrupt.

vii.   Regents' Misrepresentations that it had "duly filed UCC financing statements which . . . would perfect a first priority security interest of [Regents] in the Equipment," and that "copies of these UCC financing statements . . . have been delivered to [Prime]" were negligent and careless because Regents knew or should have through reasonable

diligence known that it did not have a perfected first-priority security interest in the Kenwood equipment and that it did not deliver evidence of such an interest to Prime.

102. As the "seller" under the Chattel Paper Agreement, Mitec Specifications, and Kenwood Specifications, Regents had a pecuniary interest in the transactions at issue in this case.

103. As an expert in the equipment lease financing business and the broker between Prime, on one hand, and Mitec and Kenwood, on the other hand, in these transactions, Regents was in a position superior to Prime to know the material facts relating to Mitec's business and financial information, including information related to MAG's German bankruptcy proceedings, and information regarding Regents' perfected security interest (or lack thereof) in the Kenwood equipment.

104. As the business broker between Prime, on one hand, and Mitec and Kenwood, on the other hand, Regents should have reasonably foreseen that Prime, as the buyer and assignee of the chattel paper, would heavily rely on Regents' communications concerning Mitec and Kenwood, including the Misrepresentations.

105. As a direct and proximate result of Regents' Misrepresentations, Prime has suffered, and continues to suffer, damages in an amount to be

31

determined at trial, but no less than $8,314,714.83.

## FIFTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

106.    Prime hereby incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

107.    As a business broker for Prime, Regents owed Prime a fiduciary duty.

108.    This fiduciary duty included, at a minimum, a duty to conduct reasonable due diligence and a duty to not misrepresent material information to Prime.

109.    A competent business broker's reasonable due diligence of Mitec in late 2018 and early 2019 would have revealed that Mitec's parent company had filed for bankruptcy. Accordingly, by failing to discover such bankruptcy and making the Misrepresentations, Regents breached its fiduciary duties to Prime.

110.    A competent business broker would have learned whether it actually had a perfected, first-priority security interest in equipment it was assigning. Accordingly, by failing to discover that Regents did not have a perfected, first-priority security interest in the Kenwood equipment and by representing that it did, Regents breached its fiduciary duty to Prime.

111.    As a direct and proximate result of Regents' breach of fiduciary duties to Prime, Prime has been damaged in an amount to be determined at trial but no

32

less than $8,314,714.83. Specifically, as a result of Regents' breaches of fiduciary duties, Prime has purchased paper concerning a debtor with a bankrupt parent, which debtor is now dissolved and unable to make payments under the paper, and has purchased paper that does not include a perfected, first-priority security interest.

## JURY DEMAND

Prime demands a jury trial on all issues triable by right of jury.

## PRAYER FOR RELIEF

Wherefore, Prime prays for judgment as follows:

A.     An order finding that Regents breached the Chattel Paper Agreement, Mitec Specifications, and Kenwood Specification and awarding damages to Prime in an amount to be determined at trial but in no event less than:

      i.     $2,453,748.11 due under the Mitec Specifications; and

      ii.     $5,860,966.72 due under the Kenwood Specifications.

B.     An order finding that Prime has been damaged by Regents' conduct and an award of damages in an amount to be determined at trial but in no event less than $8,314,714.83.

C.     An order awarding Prime, as the prevailing party, reasonable attorneys' fees as provided in the Chattel Paper Agreement and as deemed

33

appropriate by the Court.

D.      An order awarding Prime, as the prevailing party, reasonable expenses

as provided in the Chattel Paper Agreement and as deemed appropriate by the

Court.

E.      An order awarding Prime, as the prevailing party, costs as deemed

appropriate by the Court.

F.      Pre-judgment and post-judgment interest at the maximum rate

provided by law.

G.      Such other and further relief as this Court may deem appropriate

under the circumstances.

  DATED:  March 4, 2021

         STOEL RIVES LLP


         */s/ David J. Jordan*
         David J. Jordan
         Jordan C. Hilton

         *Attorneys for Prime Alliance Bank, Inc.*

109349852.7 0042618-00004