Robert S. Clark (4015)
Jonathan C. Williams (16194)
**PARR BROWN GEE & LOVELESS**
101 South 200 East, Suite 700
Salt Lake City, UT 84111
Telephone: (801) 532-7840
Fax: (801) 532-7750
rclark@parrbrown.com
jwilliams@parrbrown.com

John A. Graham (*pro hac vice*)
**JEFFER MANGELS BUTLER & MITCHELL**
1900 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
jag@jmbm.com

*Attorneys for Regents Capital Corporation*

_____

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| PRIME ALLIANCE BANK, INC., a Utah Corporation,<br><br>        Plaintiff,<br><br>v.<br><br>REGENTS CAPITAL CORPORATION, a California corporation,<br><br>        Defendant. | **REGENTS CAPITAL CORPORATION'S MOTION TO DISMISS, AND SUPPORTING MEMORANDUM**<br><br>Case No. 1:21-cv-00031-HCN<br><br>Judge Howard C. Nielson, Jr. |

### RELIEF REQUESTED AND SUMMARY OF GROUNDS FOR RELIEF

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Regents Capital Corporation

("Regents") moves to dismiss Prime Alliance Bank, Inc.'s ("Prime") second, third, fourth, and

fifth causes of action. The second claim is contradicted by publicly available UCC-1 filings of

which this court can take judicial notice. The other claims are deficient for two reasons. They do

not include factual allegations sufficient to state a plausible claim, and they also are precluded by

the economic loss rule.[1]

---

[1] To maintain an orderly development of the pleadings in this case, Regents also moves for an extension of time to answer the first claim for relief until fourteen days after a ruling on this motion.

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................... 1

A.  The Industry and the Parties ..................................................................... 1

B.  The Contract as Alleged in the Complaint ............................................... 2

1.  The Basics ...................................................................................... 2

2.  The Deal Structure ......................................................................... 4

3.  Factual Allegations Relating to the Kenwood Priority Fracas ............... 6

II.  ARGUMENT .............................................................................................................. 7

A.  Legal Standard .......................................................................................... 7

B.  Prime's Second Cause of Action Fails to Adequately Plead a Claim ........... 8

C.  Prime's Third, Fourth, and Fifth Causes of Action Fail to State Plausible Claims. ... 11

1.  The third cause of action fails to state a plausible claim for negligence. ............. 12

2.  The fourth cause of action fails to state a plausible claim for negligent misrepresentation. ........................................................................... 14

3.  The fifth cause of action fails to state a plausible claim for breach of fiduciary duty. ................................................................................................. 15

D.  Prime's Third, Fourth, and Fifth Causes of Action Are Barred by the Economic Loss Rule. ......................................................................................................... 21

III.  CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ......................................................................... 7, 11, 12
*Arnson v. My Investing Place L.L.C.*
   2013 WL 5724048 (D. Utah Oct. 21, 2013) ..................................................... 18, 19
*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 7, 11
*Berbas v. Bd. of Educ. of City of*,
   2000 WL 875728 (N.D. Ill. June 28, 2000) ............................................................ 7
*Consol. Realty Grp. v. Sizzling Platter, Inc.*,
   930 P.2d 268 (Utah Ct. App. 1996) ................................................................... 18
*First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*,
   786 P.2d 1326 (Utah 1990) ......................................................................... 16, 17
*Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*,
   2018 UT 04, 417 P.3d 95 ............................................................................. 21
*GFF Corp. v. Associated Wholesale Grocers, Inc.*,
   130 F.3d 1381 (10th Cir. 1997) ...................................................................... 7
*Giles v. Mineral Resources Int'l, Inc.*,
   2014 UT App 259, 338 P.3d 825 ..................................................................... 15
*Gold Standard Inc. v. Getty Oil Co*,
   915 P.2d 1060 (Utah 1996) .......................................................................... 16
*Grynberg v. Questar Pipeline Co.*,
   2003 UT 8, 70 P.3d 1 ................................................................................ 22
*Hal Taylor Assocs.*,
   657 P.2d 743 (Utah 1982) ...................................................................... 16, 18, 21
*Hayes v. Intermountain GeoEnvironmental Services, Inc.*,
   2019 UT App 112, 446 P.3d 594 .................................................................. 21, 24
*HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*,
   2018 UT 61, 435 P.3d 193 ................................................................ 22, 23, 24, 25
*Hodgson v. Farmington City*,
   675 F. App'x 838 (10th Cir. 2017) .................................................................... 8
*In re Burke*,
   2013 WL 4431304 (Bankr. S.D. Cal. Aug. 8, 2013) ..................................................... 8
*Jackson v. Alexander*,
   465 F.2d 1389 (10th Cir. 1972) ...................................................................... 7
*Legacy Res., Inc. v. Liberty Pioneer Energy Source, Inc.*,
   2013 UT 76, 322 P.3d 683 ........................................................................... 18
*Marchese v. Nelson*,
   809 F. Supp. 880 (D. Utah 1993) .................................................................... 17
*Norman v. Arnold*,
   2002 UT 81, 57 P.3d 997 ............................................................................ 21
*Normandeau v. Hanson Equip., Inc.*,
   2009 UT 44, 215 P.3d 152 ........................................................................... 12

*Orlando Millenia, LC v. United Title Servs. of Utah, Inc.*,
 2015 UT 55, 355 P.3d 965 ................................................................................ 16
*Reighard v. Yates*,
 2012 UT 45, 285 P.3d 1168 ........................................................................ 22, 23
*Robbins v. Oklahoma ex rel. Dep't of Human Servs.*,
 519 F.3d 1242 (10th Cir. 2008) ......................................................................... 7
*SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*,
 2001 UT 54, 28 P.3d 669 ................................................................................. 22
*Smith v. Frandsen*,
 2004 UT 55, 94 P.3d 919 ................................................................................. 14
*Springfield Fin. & Mortg. Co., LLC v. Lilley*,
 2015 WL 12780894 (D. Utah Sept. 29, 2015) ......................................... 16, 19
*Sumsion v. J. Lyne Roberts and Sons, Inc.*,
 2019 UT 14, 443 P.3d 1199 ............................................................................. 12
*Sunridge Dev. Corp. v. RB&G Eng'g., Inc.*,
 2010 UT 6, 230 P.3d 1000 ............................................................................... 22
*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) .......................................................................................... 2
*Yazd v. Woodside Homes Corp.*,
 2006 UT 47, 143 P.3d 283 ......................................................................... 18, 19


Statutes

Ohio Rev. Code Ann. § 1309.102(11) ....................................................................... 4
Ohio Rev. Code Ann. §§ 1309.103 and 1309.324 .................................................. 10
Utah Code § 61-1-13(1)(c) ....................................................................................... 18
Utah Code § 61-2f-102(20) ...................................................................................... 18
Utah Code § 70A-9a-102(11) .................................................................................... 4
Utah Code § 70A-9a-103 .......................................................................................... 10


Rules

Fed. R. Civ. P. 8(a)(2) ............................................................................................... 12
Federal Rule of Civil Procedure 12(b)(6) ........................................................*Passim*

Other Authorities

5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007) ......................................... 2
65 C.J.S. Negligence § 33 ......................................................................................... 12

I.      INTRODUCTION

     A.      The Industry and the Parties

This case is centered in the equipment finance industry. Prime's claims must be analyzed and judged in the context of the industry in which they arise, together with the contract that expressly governs the relationship between Prime and Regents.[2]

Regents is an independent commercial finance company that specializes in equipment leasing and financing solutions. Regents' headquarters is located in Costa Mesa, California. Regents provides commercial equipment financing solutions for its customers who need to finance the acquisition of equipment and software to facilitate their business goals. Specifically, Regents is able to help businesses overcome financing hurdles and structure equipment financings that might be rejected by banks and other traditional finance providers.

Prime, located in Woods Cross, Utah, is a community bank engaged in national leasing and local commercial lending. In particular, Prime frequently serves as a <u>funding source</u> for commercial equipment leasing transactions.

By way of context, equipment finance companies are responsible for financing a substantial portion of the nation's capital expenditure budget through a multitude of financial products and strategies. They are engaged in originations and primary and secondary market financing activities. Indeed, nearly 8 in 10 U.S. companies use some form of financing when acquiring equipment, including loans, leases, and lines of credit (excluding credit cards). In

---

[2] The following introduction addresses the background and context of these claims.  It is offered as a source of assistance to the Court in a complex commercial and financial arena.  Close scrutiny of the factual allegations in the Complaint will be addressed in the Argument section of this motion.

2019, an estimated $1.8 trillion was invested by U.S. businesses, nonprofits, and government agencies in plant, equipment, and software.[3]

### B. The Contract as Alleged in the Complaint

#### 1. The Basics

As alleged in the Complaint, the parties to this lawsuit are bound together by contract. Specifically, the primary contract is identified in the Complaint as the "Master Sale of Chattel Paper and Security Agreement" ("Master Agreement"). Complaint ("Compl.") ¶ 11, Dkt. No. 2. Despite the fact that the Master Agreement follows a well-known and legally supported contractual arrangement for the financing of equipment in the equipment lease industry, Prime's Complaint attempts a departure from the legal relationship established by the Master Agreement. For several reasons, the tort claims pled in the Complaint are defective because they are founded upon Plaintiff's unorthodox attempt to plead claims that ignore the very contract that Plaintiff relies on to support its claims for contractual damages. Additionally, the Complaint is defective for failing to account for the controlling UCC financing statements that appear in the publicly filed records relating specifically to the Kenwood transactions sued upon.[4]

Under the Master Agreement, the equipment leases (*i.e.* chattel paper) that were sold to Prime were structured in a routine fashion and Prime's role as the funding source for the

---

[3] *See generally*, Equipment Leasing and Finance Association, https://www.elfaonline.org/

[4] This Court must take into account the public records in determining whether the Complaint states a claim. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322–23 (2007) ("courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. See 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007)").

acquisition of the lessees' equipment was documented in a straightforward manner (Compl. ¶¶ 22–46, 55–59)—all in accordance with industry customs and practices.

In this case, two end-user companies, Mitec Powertrain, Inc. ("Mitec") and Kenwood Envision, LLC ("Kenwood"), needed to acquire very specific equipment for their business activities. Mitec and Kenwood connected with Regents, which agreed to purchase the specified equipment for each of the companies, and, in turn, directly lease the equipment to the two companies on terms that fit within their financing requirements.[5] In the case of Mitec and Kenwood, each of the lease contracts was structured for the lease payments to be made each quarter over 5 years. At the end of the term, each of Regents' customers (Mitec and Kenwood) would have the option to (i) extend the lease term, (ii) return the equipment to Regents, or (iii) purchase the equipment for the determined fair market value. As the _owner_ of the equipment, Regents would receive the proceeds from any of these options. In industry parlance, Regents held a _residual interest_ in the equipment. It booked a "residual receivable" on its books that represented the value that Regents expected to realize for the equipment at the end of the lease term. During the term of the equipment lease, as the owner of the equipment, Regents was primarily obligated to pay state personal property taxes on the equipment and if depreciation was available under applicable tax regulations, Regents, as the owner, would be able to depreciate the value of the equipment on its books in calculating its income.[6]

---

[5] The specific equipment purchased by Mitec and Kenwood is detailed in the Specifications relating to the Master Agreement.  See, Exhibits C, D, E and F to the Complaint.

[6] Depending on the lease structure, sometimes these obligations are undertaken by the lessee, similar to what occurs in a commercial real estate lease.

## 2.      The Deal Structure

Regents, like most independent equipment leasing companies, chooses to assign equipment leases it originates to banks like Prime—which are known as *funding sources*. By obtaining the funds necessary to purchase the equipment from third party vendors, an independent equipment leasing company is able to leverage the value of its business, while at the same time transferring the risk for traditional credit defaults to the funding sources, who agree to buy the leases on a <u>*non-recourse*</u> basis. *See* Compl. Exs. C, D, E, and F.

Prime, as a funding source for some of Regents' equipment lease deals, entered into the Master Agreement that controlled the relationship of the parties and governed the terms under which Prime would purchase the commercial equipment leases (*i.e.*, "chattel paper")[7] originated by Regents. Under the terms of the Master Agreement, Prime agreed to take on the role of a traditional lender who accepts the risk that its borrower (in this case, the lessee) will in the future be unable to make the payments due under the equipment lease. Essentially, by taking an assignment of the chattel paper and funding the acquisition of the equipment, the funding source is buying a defined fixed income stream to be paid by the lessee. In this case, the defined income stream was 20 quarterly payments to be made by the lessee. If the lessee defaults under the equipment leases, then under the terms of the Master Agreement, Prime bears the risk of loss as the owner of the chattel paper. Only in the event that Regents breached a <u>specific, material</u> warranty and representation contained in the Master Agreement would Prime be entitled to demand that Regents repurchase the chattel paper. A classic example would be if the chattel paper (lease) bore forged signatures and was unenforceable. However, under the Master

---

[7] See Utah Code § 70A-9a-102(11) for the Uniform Commercial Code definition of "chattel paper." *See also* Ohio Rev. Code Ann. § 1309.102(11), which is relevant to the discussion of the second cause of action.

Agreement, a normal credit default or insolvency of the lessee does not give Prime the right to demand that Regents assume the loss of the credit default by repurchasing the chattel paper. *See* Compl. Ex. A, § 8.

Faced with the express language of the Master Agreement that it signed, in the third through fifth claims for relief, Prime tries to evade its own contract by pleading traditional tort claims to take the place of the parties' express contractual duties.[8] Additionally, in a conclusory way, Prime purports to repudiate the binding legal relationship of the parties as <u>seller</u> and <u>buyer</u> of chattel paper, by calling Regents a <u>broker</u> as opposed to being the seller of the chattel paper. This deficient attempt at pleading a wholly different legal relationship fails because the contract correctly and explicitly identifies Regent as the owner of the equipment who is leasing the equipment to its customer. The Master Contract then clearly identifies Prime as the purchaser of the chattel paper. In its conclusory assertion that Regents is a broker, Prime gives no factual detail for the conclusion—it never explains who the principals are and who owns the equipment. As Black's Law dictionary states: (i) a broker is one who is engaged for another, usually on a commission, to negotiate contracts relating to property in which he or she has no custodial or proprietary interest; (ii) an agent who acts as an intermediary or negotiator, especially between prospective buyers and sellers. *See* BROKER, Black's Law Dictionary (11th ed. 2019).

Based on the inadequate facts alleged in the Complaint, Prime's attempt to wave a magic wand and re-characterize the legal structure of an entire trillion-dollar industry certainly fails. There are no adequate facts pled that can re-characterize Regents as some sort of go-between

---

[8] The so-called negligence and related claims are barred by the Economic Loss Rule, discussed later.

broker. Prime certainly accepted the legal structure defined in the Master Agreement[9] and ratified this legal structure by affirming the contract when it sued for breach of contract damages. Unless Prime can plead unique facts that would allow it to upend the legal import of its own contract, all liability claims based on Prime's unsupported allegations in the Complaint that Regents acted as a broker in the equipment lease transactions must be dismissed.

The same applies to Prime's somewhat fanciful conclusory allegations that assert Regents had unique and special fiduciary duties to Prime. As will be explored below, a commercial equipment leasing company and a commercial bank do not have fiduciary duties to each other in consummating commercial deals pursuant to a commercially negotiated contract arrived at by arms-length bargaining.

### 3.     Factual Allegations Relating to the Kenwood Priority Fracas

When Kenwood defaulted on its payment obligations, with very limited exceptions, the applicable contractual obligations do not include a basis for Prime to seek recourse against Regents. *See* Compl. Exs. E and F. Prime's attempt to fit within one of those narrow exceptions includes a conclusory assertion that is not supported by details in the Complaint, and not supported by public records that contradict the allegations and are subject to judicial notice. Paragraph 88 of the Complaint asserts that Regents failed to deliver a "perfected" security interest in the Kenwood equipment lease assigned to Prime. No detailed facts are alleged to support that conclusion. And the public records of UCC-1 financings completely contradict the claim. As explained below, the contract claim relating to Kenwood is deficient and must be dismissed.

---

[9] Prime and Regents consummated more than 30 different fundings under the legal structure dictated by the Master Agreement.

## II.       ARGUMENT

### A.       Legal Standard

Rule 12(b)(6) requires dismissal of a complaint if a plaintiff fails "to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The burden is on the plaintiff to 'frame a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

One of the basic tenets of pleading and stating a claim is that allegations should be ignored when they repudiate the very facts and circumstances of a contract that is attached to a plaintiff's complaint. Where a plaintiff is affirming the contract, and suing for breach of the contract, the contract controls. Facts pled which are in derogation of the contract cannot be used to state a claim. *Berbas v. Bd. of Educ. of City of Chic.,* 2000 WL 875728, at *4 (N.D. Ill. June 28, 2000) ("When . . . an exhibit contradicts an assertion in the complaint and reveals information which prohibits recovery as a matter of law, the information provided in the exhibit trumps the assertion in the complaint."); *see also Jackson v. Alexander*, 465 F.2d 1389, 1390 (10th Cir. 1972) ("we need not accept as true mere legal conclusions nor allegations of fact that are at variance with the express terms of an instrument attached to the complaint as an exhibit and made a part thereof"). A court is permitted to look at documents attached to a complaint to determine whether a plaintiff is entitled to relief. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384–85 (10th Cir. 1997).

### B.     Prime's Second Cause of Action Fails to Adequately Plead a Claim.

In a Rule 12(b)(6) motion to dismiss, district courts are entitled to take judicial notice of certain facts and documents outside the pleadings "without converting the motion to dismiss into a motion for summary judgment." *Hodgson v. Farmington City*, 675 F. App'x 838, 840–41 (10th Cir. 2017) (unpublished). Specifically, courts may take judicial notice of public record UCC filings in deciding whether to dismiss a cause of action. *See In re Burke*, No. ADV 12-90311-MM, 2013 WL 4431304, at *2 (Bankr. S.D. Cal. Aug. 8, 2013) ("the Court takes judicial notice of the documents attached to the filings in the main bankruptcy case and the public record UCC filings that were attached by Burke in his request for judicial notice. For purposes of this Rule 12(b)(6) motion, the Court need not accept as true allegations that contradict facts which may be judicially noticed . . . . The Court also need not accept as true legal inferences the Complaint asserts, particularly where as here, the legal conclusions are based upon a misstatement of secured transaction law.")

The Master Agreement allocates the credit risk to the purchaser of the chattel paper (*i.e.*, leases). This is true for all the lease agreements Prime purchased from Regents, including the Kenwood lease agreements. The allegations of the Complaint discussing the Kenwood lease agreements are set out in ¶¶ 54–64 of the Complaint, but as additional context, Kenwood was opening a new upscale movie theater and combined dining complex. Unfortunately, its business had a head-on collision with COVID-19, which ultimately led to the demise of the business and the lessee's ability to make the lease payments. Instead of accepting the fact that it is contractually required to bear the credit loss as a result of Kenwood's inability to make the lease payments, Prime alleges that Regents failed to deliver a "perfected" interest in the Kenwood equipment as part of its sale/assignment of the chattel paper to Prime. Compl. ¶ 63. Prime's

allegation is wholly deficient because it does not plead any specific facts that set forth the official Ohio[10] Uniform Commercial Code recording records. Hence, the Complaint fails to allege the detailed facts to support the conclusion that Regents, as the original lessor, did not hold a first/senior perfected interest in the Kenwood equipment and underlying lease, which 5-year lease was eventually sold to Prime.

First, an owner of equipment like Regents does not have to record a UCC-1 financing statement to perfect its ownership in equipment. In general, owners of personal property do not have to file financing statements to evidence their direct ownership in personal property.[11] Nonetheless, as is the usual practice in the lease finance industry, commercial equipment leasing companies, such as Regents, typically file a precautionary UCC financing statement to obviate any argument by a bankruptcy trustee or adverse secured party who might claim the equipment lease is really a financing device and that the equipment owner should be categorized as a lender instead of an owner. In this case, the Ohio public records show that Regents filed two precautionary UCC financing statements for each of the Kenwood equipment schedules. Copies of the two recorded UCC financing statements are attached hereto collectively as Exhibit A (Exhibit A also includes copies of the recorded assignments showing the transfer of the rights under the recorded UCC financing statements to Prime).[12]

---

[10] Kenwood Envision, LLC is located in Ohio. And the Kenwood equipment is also located in Ohio. Thus, the enforceability of the security interest is governed by Ohio law.

[11] If your neighbor asks to rent your lawnmower for four weeks until his lawnmower is repaired, do you have to file a UCC financing statement to protect your lawnmower from being seized by your neighbor's creditors or lenders?  Of course not.

[12] The precautionary UCC Financing Statements state, in part, "The equipment described herein is owned by and is the property of the Secured Party and is leased to the Debtor in a transaction which does not constitute a financing transaction.  This filing is made for information purposes."

Prime's complaint fails to plead facts that would allow this Court to ignore an official government record evidencing Regents' perfected first-position interest in Kenwood's equipment. The Court should note that although the Complaint alleges that a bank called CenterBank has a senior lien ahead of Regents' ownership of the equipment, the Complaint fails to include or refer to the official Ohio Secretary of State government recording records regarding CenterBank. This is a fatal flaw because the Complaint fails to adequately allege that CenterBank filed a UCC 1 Financing Statement prior to the two UCC Financing Statements filed by Regents.

For whatever reason, Prime failed to properly plead the facts relating to the Ohio Secretary of State's official recording records that would support its allegation in paragraph 63 of the Complaint that the security interest was not perfected. **CenterBank's UCC-1 was filed on October 29, 2019**.[13] **Regents' two UCC-1 Financing Statements were filed respectively on April 22, 2019 and July 22, 2019.** Hence, Regents' precautionary UCC Financing Statements were recorded many months before CenterBank's UCC Financing Statement.[14]

---

[13] A copy of CenterBank's filed UCC financing statement is attached hereto as Exhibit B.

[14] Even if Regents' precautionary UCC financing statements were recorded after CenterBank's UCC financing statement, Regents would still have a perfected first position in the equipment it purchased under Article 9 of the Uniform Commercial Code as a purchase money security interest (PMSI).  A purchase money security interest is a special type of security interest that enables those who finance a debtor's acquisition of goods to acquire a first-priority security interest in the purchase-money collateral.  This special type of security interest facilitates and allows companies to secure equipment financing, even though a company may have already provided its line bank with a blanket lien on all its assets.  *See* Ohio Rev. Code Ann. §§ 1309.103 and 1309.324 and Utah Code §§ 70A-9a-103, 324.  In this case, Regents, in proving its priority, does not have to resort to factual arguments regarding its purchase money security interest status because the Ohio Secretary of State's official recordings show that Regents UCC financing statements were recorded first in time ahead of CenterBank's financing statement.

Prime alleges that Regents breached a representation in the Master Agreement because it transferred the Kenwood equipment lease to Prime that was not senior in priority to the adverse claim of another secured party, CenterBank. *See* Compl. ¶ 64. This allegation is completely deficient and does not state a claim because the allegation fails to allege the relevant and <u>necessary</u> facts of the Ohio Secretary of State's official records. The official recording records of the Ohio Secretary of State must be considered if one is to state a claim that Prime's interest in the Kenwood equipment is junior and inferior to CenterBank because the Uniform Commercial Code looks to the official government UCC filing records to determine priority. The official government recording records—subject to judicial notice for purposes of Rule 12(b)(6)—belie Prime's inadequate factual assertions and Prime's claim that Regents breached a representation based on another creditor's assertion of a senior lien cannot be countenanced and the claims dependent upon assertion of lack of priority must be dismissed.

### C.   Prime's Third, Fourth, and Fifth Causes of Action Fail to State Plausible Claims.

To survive a motion to dismiss, the complaint must show "more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (alteration in original). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it

has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (second alteration in original).

Prime's third, fourth, and fifth causes of action do not move the needle from possibility to plausibility.

### 1. The third cause of action fails to state a plausible claim for negligence.

These parties did business under a Master Agreement and multiple follow-on written agreements. They are sophisticated parties, who did business at arm's length. The contractual relationship is set out clearly in the Complaint. Any attempt to plead the basis for a general duty under tort law is deficient. To prevail on a negligence claim, the plaintiff must establish "(1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was the proximate cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages." *Sumsion v. J. Lyne Roberts and Sons, Inc.*, 2019 UT 14, ¶ 12 n.1, 443 P.3d 1199.

Prime's negligence claim is conclusory and implausible on each element, but most critically, it fails to establish a plausible basis for concluding that Regents had a duty outside those duties created under the Agreements.[15] "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Normandeau v. Hanson Equip., Inc.*, 2009 UT 44, ¶ 19, 215 P.3d 152. However, "[c]onduct which merely is a breach of contract is not a 'tort.'" 65 C.J.S. Negligence § 33 (collecting authorities). In other words, if a contract is the only source of the duty allegedly breached, then the negligence claim fails:

---

[15] The agreements attached as Exhibits A–F to the Complaint are hereafter referred to as the "Agreements."

> Tort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others. They are obligations imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction. Therefore, if the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the *only* theory upon which liability would be imposed.

Prosser and Keeton on Torts, § 92 at 656 (5th ed. 1984).

In this case, Prime attempts to conflate its negligence claims with the contractual source of duty, which it asserts that Regents breached. Prime states that,

> Regents owed Prime an independent duty of care, which required Regents to act reasonably, including making reasonable due diligence inquiries and efforts . . . Regents owed such an independent duty of care to Prime for at least the following reasons: *because Prime and Regents were in privity of contract*; because Regents was in a superior position to know the material facts than was Prime; because Prime's injuries in the event of a breach of Regents' duty of care were highly foreseeable. . . .

Complaint ¶ 92 (emphasis added).

To call a duty independent does not make it so. Any alleged obligation to provide information to Prime during the due diligence process is an integral component of the Master Agreement. *See* Master Agreement § 2 (stating that Regents is obligated to deliver due diligence documents to Prime "in form and substance satisfactory" to Prime; stating that Regents must provide "such other documents as [Prime] may reasonably request"; etc.). Accordingly, even if Regents failed to do that as Prime alleges in the paragraph quoted above—which Regents squarely denies—it would be subject to breach of contract liability, not liability borne from negligence. Thus, Prime has failed to allege anything beyond a "sheer possibility" of a duty independent from the Agreements; it has not moved the allegations of an independent duty into the realm of plausibility.

**2.      The fourth cause of action fails to state a plausible claim for negligent misrepresentation.**

These sophisticated parties understood that under the Master Agreement and the multiple follow-on written agreements that they were conducting business at arm's length. They agreed by contract to define how and what information was to be provided by Regents to Prime. No allegation of the Complaint sets out a different understanding. Thus, any attempt by Prime to plead that a general duty under tort law governs rings false. In "order to prevail in an action for negligent misrepresentation, plaintiffs must identify a representor who makes an affirmative assertion which is false . . . . [I]n addition to affirmative misstatements, an omission may be actionable as a negligent misrepresentation where the defendant has a duty to disclose." *Smith v. Frandsen*, 2004 UT 55, ¶ 10, 94 P.3d 919 (internal citations and quotations marks omitted). Accordingly, "a duty to disclose is a necessary element of the tort of negligent misrepresentation." *Id.*

Similar to its claim for negligence, Prime's claim for negligent misrepresentation also suffers from want of a plausible independent duty. Prime quotes from the Agreements and states that because the quoted language proved to be false, Regents is liable for negligent misrepresentation. *See* Complaint ¶ 96(i–vi) (quoting the representations and warranties from the Master Agreement). Yet if the alleged negligent misrepresentations form the representations and warranties in the Agreements, they necessarily are not independent from the Agreements.

Accordingly, in the same way Prime fails to state a plausible basis by which Regents has a duty independent of the Agreements that gives rise to negligence liability, Prime fails to state a plausible basis by which Regents has an independent to disclose information regarding the transactions at issue.

>    3.    **The fifth cause of action fails to state a plausible claim for breach of fiduciary duty.**

All detailed factual allegations of the Complaint lay out a straightforward business relationship between Prime and Regents that was memorialized in written contracts. Prime and Regents dealt with each other as sophisticated business entities capable of identifying their own due diligence needs. At no point did either party look to the other as advancing the other's interest over their own. Instead, they were arms-length counterparties to multiple transactions.

"To prove a breach of fiduciary duty claim, a plaintiff must demonstrate that the defendant owed a duty, the defendant breached the duty, the plaintiff suffered damages, and the plaintiff's damages were actually and proximately caused by the defendant's breach." *Giles v. Mineral Resources Int'l, Inc.*, 2014 UT App 259, ¶ 6, 338 P.3d 825. Prime does not meet the second element of a fiduciary duty claim because it fails to state a plausible basis by which Regents could owe Prime any fiduciary duties. Instead of supplying allegations sufficient to meet the standard for what constitutes a fiduciary relationship, Prime simply states, "As a business broker for Prime, Regents owed Prime a fiduciary duty." Complaint ¶ 107. This is deficient for two reasons: First, Regents does not owe Prime any fiduciary duties because—as alleged throughout the Complaint—their relationship was adversarial; and second, Prime fails to establish the elements required to otherwise show a fiduciary relationship.

### a.  The relationship between Prime and Regents was arms-length.

Regents and Prime only interacted as counterparties to the sale of assets. Regents did not arrange a transaction by which Prime would purchase a third-party's asset. ***Regents owned the assets in question***. It was the seller and Prime was the buyer. In short, Regents and Prime interacted at arms-length, thus foreclosing any possibility of a fiduciary relationship.

"A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty *to act primarily for the benefit of another.*" *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (emphasis added). "A 'fiduciary relationship' exists between two parties when one of them is required to act for the benefit of the other on all matters within the scope of their relationship." *Orlando Millenia, LC v. United Title Servs. of Utah, Inc.*, 2015 UT 55, ¶ 34, 355 P.3d 965 (internal citation and alterations omitted). Thus, necessarily, "[n]o fiduciary relationship arises when the parties conduct 'arm's length' transactions." *Springfield Fin. & Mortg. Co., LLC v. Lilley*, No. 2:14-CV-00679-EJF, 2015 WL 12780894, at *4 (D. Utah Sept. 29, 2015) (unpublished). When the parties interact at arm's length, one party cannot later argue that notwithstanding that fact they had "been induced to relax the care and vigilance [they] would ordinarily exercise." *Hal Taylor Assocs.*, 657 P.2d 743, 749 (Utah 1982).

In *Gold Standard Inc. v. Getty Oil Co*, 915 P.2d 1060 (Utah 1996), the plaintiff, Gold Standard Inc. ("GSI"), argued that because the defendant, Getty Oil Co. ("Getty"), was the owner of the asset covered by the parties' contract, Getty was GSI's fiduciary and accordingly had an obligation to protect GSI's interests. The Utah Supreme Court disagreed and held:

> [I]t is readily apparent that GSI's argument that Getty should have acted as its fiduciary but failed to do so is without merit. Under Utah law, a fiduciary or confidential relationship will be found only when one party, having gained the trust and confidence of another, exercises extraordinary influence over the other party . . . . Moreover, when the parties deal "at arm's length" or in an adversarial relationship, no fiduciary relationship can be said to exist . . . . Given the adversarial nature of the relationship between GSI and Getty, as well as the fact that the parties consistently dealt with each other at arm's length, it cannot be said that Getty served as GSI's fiduciary here.

*Id.* at 1064 (internal citations and quotation marks omitted).

16

Just as in *Gold Standard*, Regents and Prime were on opposite sides of the transaction. Regents was selling its "rights, interest in and title to certain Paper . . . together with all monies due, monies to become due, and all other agreements, instruments and documents related thereto" to Prime. Master Agreement § 2(a). Prime could either move forward with the deal or, if its due diligence revealed negative indicators, it could reject the deal. This typifies the very definition of an arm's-length transaction. *See* ARM'S-LENGTH, Black's Law Dictionary (11th ed. 2019) ("Of, relating to, or involving dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship"). Given that Regents was the sole owner of the papers at issue, and thereby motivated by its very business model to sale those papers, it cannot be said that it could be acting "primarily for the benefit of" Prime. *See First Sec. Bank of Utah*, 786 P.2d at 1333.

Accordingly, Prime's claim for breach of fiduciary duty fails to state more than a possibility of a fiduciary relationship. It fails to show that there is a plausible basis by which Prime and Regents—the two sides of an arm's length transaction—created a fiduciary relationship.

b. **Prime's allegations do not otherwise state a plausible fiduciary duty.**

"The question of whether a fiduciary relationship exists is a question of state law." *Marchese v. Nelson*, 809 F. Supp. 880, 893 (D. Utah 1993). Under Utah law, courts have noted that there are generally two types of fiduciary relationships:

> (1) those specifically created by contract such as principal and agent, attorney and client, and trustee and *cestui que trust,* for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor or administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.

*First Sec. Bank of Utah*, 786 P.2d at 1332 (Utah 1990) (internal alterations omitted).

Generally speaking, those fiduciary relationships created by contract or formal legal proceedings are governed by detailed regulatory and statutory frameworks. *See, e.g.*, Utah Code § 61-2f-102(20) (defining broker in the real estate context); *Consol. Realty Grp. v. Sizzling Platter, Inc.*, 930 P.2d 268, 274 (Utah Ct. App. 1996) (defining contours of real estate broker's fiduciary duties); *see also* Utah Code § 61-1-13(1)(c) (defining broker in the securities context); *Legacy Res., Inc. v. Liberty Pioneer Energy Source, Inc.*, 2013 UT 76, ¶¶ 20–28, 322 P.3d 683 (defining contours of securities broker's fiduciary duties).

By contrast, fiduciary duties implied in law occur in "circumstances where equity will imply a higher duty in a relationship because the trusting party has been induced to relax the care and vigilance he would ordinarily exercise. In such a case, the evidence must demonstrate the placement of trust and reliance such that the nature of the relationship is clear." *Hal Taylor Assocs. v. Unionamerica, Inc.*, 657 P.2d 743, 749 (Utah 1982). Whether a duty exists under this framework is a legal question, which courts analyze by examining "the structure and dynamics of the relationship between the parties" including their "legal relationships" and "the duties created by [those] relationships." *Yazd v. Woodside Homes Corp.,* 2006 UT 47, ¶ 15, 143 P.3d 283. "Age, knowledge, influence, bargaining power, sophistication, and cognitive ability are but the more prominent among a multitude of life circumstances that a court may consider in analyzing whether a legal duty is owed by one party to another." *Id.* ¶ 16.

*Arnson v. My Investing Place L.L.C.*, 2:12-cv-865, 2013 WL 5724048 (D. Utah Oct. 21, 2013) (unpublished) illustrates how courts determine whether a party has assumed a fiduciary duty implied-in-law. In *Arnson*, the defendants established an investing arrangement whereby the plaintiffs committed their credit to finance a large housing development. *See id.* at *1. The plaintiffs executed construction agreements so that the developer could take out construction

loans to build the development. *See id.* In exchange for that commitment, the defendants would pay the Plaintiffs a flat fee for each building unit financed, "make payments on the construction loans, and clear the Plaintiffs' credit either by selling the units after they were built or by refinancing the loans." *Id.* The defendants were also obligated to seek out banks who were willing to make these construction loans to the Plaintiffs. *See id.* at 2. Eventually the defendants secured funding through Lawrence Bank. *See id.*

Unfortunately, after some initial progress, the development stalled and the Defendants failed to make the required loan payments. The construction loans went into default, leaving the Plaintiffs responsible for repayment. *See id.* The Plaintiffs sued Lawrence Bank for numerous causes of action, including breach of fiduciary duty. *See id.*

The court dismissed the claim and found that Lawrence Bank had no fiduciary duty to Plaintiffs notwithstanding its superior knowledge:

> At most, the Plaintiffs' allegations establish that [Lawrence Bank's representative] met with the [development] Defendants to understand the investment, that he received monthly reports, and that he visited the construction site four times. But a bank conducting due diligence does not transform the relationship between a borrower and a lender into one giving rise to a duty based on superior knowledge or a special relationship. There was no reason for Lawrence Bank to assume that the Plaintiffs had not conducted their own due diligence, and the bank's practices here did not extend beyond the traditional role of a lender. As a result, Lawrence Bank and [and its representative] did now owe the Plaintiffs a fiduciary duty.

*Id.* at *4.

Similar to Lawrence Bank in *Arnson*, Regents owed no fiduciary duty to Prime. First, just as in *Arnson*, there is no allegation in the Complaint that the Agreements between Prime and Regents created a fiduciary relationship of the order contemplated by the first category of fiduciary relationships (*e.g.*, attorney-client, executor or administrator of an estate, statutorily

defined and regulated). Accordingly, just as in *Arnson*, to the extent any fiduciary duty exists, it will be as a duty implied-in-law.

Prime's allegations of an implied-in-law fiduciary duty fail for the same reason the allegations by the Plaintiffs in *Arson* failed: Prime was obligated to conduct its own due diligence. Throughout the Master Agreement, the onus is on the buyer (*i.e.*, Prime) to conduct due diligence to its own satisfaction before purchasing the chattel paper. For example, section 2(c) of the Master Agreement states:

> Prior to and as a condition precedent to the purchase of each item of Paper hereunder, Seller shall deliver, ***in form and substance satisfactory to buyer,*** the following:
> . . . .
> (vii) ***such other documents as Buyer may reasonably request***, including but not limited to subordinations, no Interest letters, landlord/mortgagee waivers, a certificate of incumbency of the Debtor, resolutions of the Debtor's Board of Directors authorizing the transaction and, with respect of transactions involving Equipment with a purchase price of $750,000.00 or more, an opinion of counsel to the Debtor, ***if requested by Buyer.***

Master Agreement § 2(c) (emphasis added).

Moreover, the Master Agreement gives the buyer (*i.e.*, Prime) the complete discretion to reject a chattel paper if it determines after conducting its own due diligence that the debtor's ability to make payments are in any way compromised *or potentially compromised*: "***Buyer shall not be obligated to purchase any Paper in respect of a Debtor previously approved if***" various conditions are met. Master Agreement § 2(d) (emphasis added).

Accordingly, just as in *Arnson*, this Court should dismiss Prime's claim for breach of fiduciary duty because Prime has failed to make allegations sufficient to show that a fiduciary relationship between it and Regents was not just possible but probable. Indeed, the only way Prime's breach of fiduciary duty claim survives is by focusing only on the terms in the Agreements that favor Prime and ignoring those that do not, *i.e.*, the ones that impose affirmative

duties on Prime. However, doing that would completely change the agreed-upon business relationship between Prime and Regents such that Prime only had upside and Regents had all the downside.

In short, nothing in the Agreements supports the idea that Prime would be justified to "relax the care and vigilance" it would otherwise exercise in a financing arrangement. *See Hal Taylor Assocs.*, 657 P.2d at 749. And the other circumstances that courts consider when deciding whether one party owes a legal duty to another—age, knowledge, influence, bargaining power, sophistication, and cognitive ability—simply do not apply: *Prime is a sophisticated party capable of understanding contracts and capable of exiting negotiations over a deal if it feels uncomfortable*. Accordingly, this Court should reject Prime's argument that Regents was its fiduciary and dismiss Prime's fifth cause of action.

> ### D. Prime's Third, Fourth, and Fifth Causes of Action Are Barred by the Economic Loss Rule.

Prime's claims for negligence, negligent misrepresentation, and breach of fiduciary duty—*i.e.*, Prime's third, fourth, and fifth causes of action—are tort-based claims. *See Hayes v. Intermountain GeoEnvironmental Services, Inc.*, 2019 UT App 112, ¶ 5, 446 P.3d 594 (stating that claims for negligence and negligent misrepresentation sound in tort law); *Norman v. Arnold*, 2002 UT 81, ¶ 35, 57 P.3d 997 ("In Utah, a claim for breach of fiduciary duty is an independent tort that, on occasion, arises from a contractual duty"); *see also Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 2018 UT 04, ¶ 55, 417 P.3d 95 ("The essential elements of a negligence claim incorporate virtually the same requirements as a breach of fiduciary duty claim"). Accordingly, because these tort claims are substantively identical to Prime's claims for breach of contract and because the alleged wrongdoing is the subject matter of Agreements, those claims are barred by the economic loss rule.

The economic loss rule consists of "two complementary yet distinct applications," the second of which is applicable in this case. *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 2018 UT 61, ¶ 12, 435 P.3d 193. "First, it bars recovery of economic losses in negligence actions unless the plaintiff can show physical damage to other property or bodily injury." *Id.* (citing *Sunridge Dev. Corp. v. RB&G Eng'g., Inc.*, 2010 UT 6, ¶ 28, 230 P.3d 1000). "Second, the economic loss rule applies when a contract exists between the parties." *Id.* The Utah Supreme Court explained the justification for the economic loss rule as follows: "[T]ort law should govern the duties and liabilities imposed by legislatures and courts upon non-consenting members of society, and contract law should govern the bargained-for duties and liabilities of persons who exercise freedom of contract." *Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 41, 70 P.3d 1.

Prime's claims for negligence, negligent misrepresentation, and breach of fiduciary duty are barred by the second branch of the economic loss rule. "This branch declares that 'when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort.'" *HealthBanc*, 2018 UT 61, ¶ 12 (quoting *Reighard v. Yates*, 2012 UT 45, ¶ 20, 285 P.3d 1168). Relief for expectations under a contract "come from the contract itself, not from third parties." *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 35, 28 P.3d 669.

The Utah Supreme Court identified the proper inquiry for whether this second branch of the economic loss rule applies: "The *Reighard* inquiry asks whether the contract covers the subject of the tort claims—in other words whether the basis for the plaintiff's tort claims is distinct and separable from the basis for the contract claims." *HealthBanc*, 2018 UT 61, ¶ 15. *Reighard* further provides "once there is a contract, any tort claim must be premised upon an

independent duty that exists apart from the contract. All contract duties, and all breaches of those duties . . . must be enforced pursuant to contract law." *Reighard*, 2012 UT 45, ¶ 21. Thus, where a tort claim seeks recovery based on conduct that is also a breach of the contract, those claims must be enforced pursuant to contract law, not tort law. This is true even if there would have been a tort duty in the absence of the contractual agreement. *See id.* ¶ 25; *see also HealthBanc*, 2018 UT 61, ¶ 14 (holding that economic loss doctrine applied because "'[a]ny tort duties' owed to the plaintiffs 'overlap[ped] with [defendant's] contract duties to the [plaintiffs]'").

The facts in *HealthBanc* illustrate the breadth of this second branch of the economic loss rule. In *HealthBanc*, the defendant, Synergy Worldwide, Inc., bought the "Greens Formula" from the plaintiff, HealthBanc International, LLC. The "Greens Formula [was] a health supplement alleged to provide health benefits." *Id.* ¶ 2 n.1. HealthBanc assigned its rights to the Greens Formula to Synergy, and in return, Synergy agreed to pay HealthBanc royalties for the sale of products containing the Greens Formula. In the royalty agreement, HealthBanc made the following representation and warranty:

> HealthBanc hereby represents and warrants that it is the sole and exclusive owner of the entire rights, title and interest, including without limitation all patent, trademark, copyright and other intellectual property rights, in and to the Greens Formula . . . free and clear of all liens, claims or encumbrances.

*Id.* ¶ 2.

Sometime after entering the royalty agreement, HealthBanc sued Synergy, alleging Synergy made incomplete royalty payments. *Id.* ¶ 3. Synergy filed a counterclaim for breach of contract asserting that HealthBanc did not own the Greens Formula. *Id.* ¶ 4. Synergy also filed a counterclaim for fraudulent inducement, alleging that HealthBanc "misrepresented that it had the exclusive right to use, assign or sell the Specified Greens Formula and its associated intellectual property rights." *Id.* ¶ 5. Under these circumstances, the Court held that Synergy's claim for

23

fraudulent inducement was barred: "In cases like this one, where the party's tort claim is a mere duplication of its breach of contract claim, there is no exception to the economic loss rule. The tort claim is barred." *Id.* ¶ 10.

In reaching that conclusion, the Court reasoned that "[c]ontracts are negotiated first and drafted second. To claim that a promise is independent of a contract simply because it was spoken prior to the formation of a contract would open the door to tort liability for all pre-contractual negotiations that were eventually enshrined in a contract." *Id.* ¶ 19. The Court also emphasized that it makes no difference if the tortfeasor's acts were knowing and intentional: "Intentional bad acts are insufficient by themselves to justify an exception to the economic loss rule. If the 'bad acts' (even intentional ones) are covered by a contract, they remain in the realm of contract law. And contract law remains sufficient to 'punish' the breaching party." *Id.* ¶ 20.

Just as in *HealthBanc*, the Agreements in this case cover "the subject of the tort claims"—*i.e.*, Prime's tort claims seek to recover damages allegedly arising from the exact same conduct alleged to be at issue in Prime's claims for breach of contract. Likewise, Prime's tort claims are a "mere duplication of its breach of contract" claims. Prime's allegations in all five causes of action revolve around the same alleged wrongdoing:

1.   Regents failed to inquire into and discover the financial health of Mitec's parent. *See* Complaint ¶¶ 79(i–ii) (first claim for breach of contract); ¶ 93 (third claim for negligence); ¶¶ 101(i–ii) (fourth claim for negligent misrepresentation); and ¶ 109 (fifth claim for breach of fiduciary duty).

2.   Regents failed to inform Prime of Mitec's parent corporation's bankruptcy after learning about it. *See* Complaint ¶¶ 79(iii–v) (first claim for breach of contract); ¶ 93 (third claim for negligence); ¶¶ 101(iii–iv) (fourth claim for negligent misrepresentation); and ¶ 109 (fifth claim for breach of fiduciary duty).

3.   Regents failed to file and deliver to Prime UCC financing statements that would perfect a first-priority security interest in the Kenwood equipment. *See* Complaint ¶¶ 88(i–iv) (second claim for relief for breach of contract); ¶ 93 (third claim for

relief for negligence); ¶¶ 101(vii [sic]) (fourth claim for negligent misrepresentation); and ¶ 110 (fifth claim for breach of fiduciary duty).

Quite simply, Prime has brought five claims for breach of contract. The alleged misconduct that gives rise to Prime's tort claims and the alleged misconduct that gives rise to its breach of contract claims is the same.

Additionally, even if its contract claims and tort claims were not a mere duplication of one another, it can hardly be argued that Prime's tort claims are not covered by the subject matter of the Agreements. The Agreements cover every aspect of the relationship between Prime and Regents. And as the Utah Supreme Court stated in *HealthBanc*, "when a conflict arises between parties to a contract *regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort.*" *HealthBanc*, 2018 UT 61, ¶ 12.

Accordingly, because Prime's contract claims and tort claims are duplicative and because the Agreements cover the subject of the tort claims, this Court should dismiss Primes third, fourth, and fifth causes of action under the economic loss rule.

### III.    CONCLUSION

For the foregoing reasons, the Court should dismiss Prime's second, third, fourth, and fifth claims for relief and provide the entirety of the relief outlined in the "Relief Requested" section of this Motion.

Respectfully submitted this 23rd day of April 2021.

**PARR BROWN GEE & LOVELESS**

*/s/ Robert S. Clark*
Robert S. Clark
Jonathan C. Williams

and

**JEFFER MANGELS BUTLER & MITCHELL**

*/s/ John A. Graham*
John A. Graham
*Attorneys for Defendant Regents Capital Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of April 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to the following:

> David J. Jordan (1751)
> david.jordan@stoel.com
> Jordan C. Hilton (17506)
> jordan.hilton@stoel.com
> STOEL RIVES LLP
> 201 S Main Street, Suite 1100
> Salt Lake City, UT 84111
>
> *Attorneys for Prime Alliance Bank, Inc.*

PARR BROWN GEE & LOVELESS, P.C.

 */s/ Robert S. Clark*
Robert S. Clark

27